**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRADLEY FLINT,<br><br>                    Plaintiff,<br><br>          v.<br><br>LANGER TRANSPORT CORP. (a corporation doing business in the State of New Jersey), THE DOW CHEMICAL CO. (a corporation doing business in the State of New Jersey), NOVA FABRICATING INC. (a corporation doing business in the State of New Jersey), ABC CORP. I-III (entities whose identity are yet unknown), VANOMMEREN TANK TERMINALS GULF COAST, INC. and/or VANOMMEREN BULK HOLDINGS and/or VANOMMEREN BULK STORAGE, INC. and/or INTERNATIONAL MATEX TANK TERMINALS, INC., JOHN DOES I-III (individuals whose identity is now yet known), JEFFREY M. JACKSON, JOHN DOE II,<br><br>                    Defendants. | **OPINION**<br><br>Civ. No. 06-3864 (WHW) |

**Walls, Senior District Judge**

        Defendants IMTT-Bayonne ("IMTT") and Jeffrey Jackson move for summary judgment

on the negligence claims of plaintiff Bradley Flint.  IMTT also moves to strike portions of the

certification of plaintiff's expert, Donald T. Aull.  Defendant Langer Transport Corp. ("Langer")

moves for summary judgment on all cross-claims.  Pursuant to Rule 78 of the Federal Rules of

Civil Procedure, the motions are decided without oral argument.  IMTT's motion for summary

FOR PUBLICATION

judgment is granted.  IMTT's motion to strike is denied as moot.  Jeffrey Jackson's motion for

summary judgment is granted.  Langer's motion is denied as moot.

## FACTUAL BACKGROUND

The following facts, material to these motions, are undisputed by the parties.  The factual

background first forms around defendant Jeffrey Jackson.  Jackson worked as a truck driver for

defendant Langer.  Langer, a motor carrier, transports liquid chemicals in tanker trailers for

various customers, including Dow Chemical Company ("Dow").  (Df. Ex. F, Langer Dep.)

When Dow needs a load to be transported, it sends a bid proposal to Langer.  (Df. Ex. G, Katz

Dep.)  The bid proposal lists the type of product to be transported, the pick-up location of the

load, and its destination.  (Id.)  If Langer accepts the bid, Langer designates the appropriate

truck, aluminum or stainless steel, and assigns a driver to transport the load.  (Id.)  The load

involved in this case resulted from a bid to transport 45,000 pounds of Dow's chemical Versene

100 XL ("Versene") from the IMTT facility in Bayonne, New Jersey, to Ecolab Ltd. ("Ecolab")

in Mississauga, Ontario, Canada.  (Df. Ex. I, Butler Dep.)  Versene 100 XL is a chemical acid

corrosive in the presence of aluminum; it must be transported in a stainless steel trailer.

On July 6, 2004, Langer issued a "Truckers Request Loading Form" to Jackson, in order

for him to pick up tanker trailer #749 from the Langer facility.  (Pl. Ex. H, Truckers Request

Loading Form.)  Tanker trailer #749 was an aluminum trailer.  That day, Jackson attached his

truck to the trailer and drove to the IMTT facility to pick up the load.  Once there, plaintiff

asserts that Jackson went through a series of checks by IMTT employees which failed to

recognize that Jackson was driving an aluminum trailer, although loaded with the corrosive

Versene.  Finally, Jackson took a sample of the loaded Versene to the IMTT lab, signed the

IMTT Tank Truck Loading Report, and left.

FOR PUBLICATION

Jackson arrived at Ecolab in Canada on July 7, 2004. Ecolab required a test sample before it would unload the product into its storage facilities. (Pl. Ex. I, Jackson Dep.) The Ecolab technician tested the Versene in Jackson's trailer and determined that the product was contaminated. A second test resulted in the same conclusion. Ecolab rejected the load. (Id.) Jackson drove to a truck stop, inspected the trailer and noticed some dampness and discoloration on the back rib section. (Id.) He notified Langer of the situation, and was advised to cross the border and return to the United States. He received a fax from Langer with the necessary travel documents to permit him to cross the border. (Id.)

Plaintiff Bradley Flint now enters the scene. Jackson was informed by Langer that Flint, who had recently finished carrying a load for Langer in a stainless steel trailer, was located at the same truck stop as Jackson. (Id.) The original plan advanced by Langer was to transload the Versene from Jackson's trailer into Flint's trailer at a tanker trailer cleaning facility in Buffalo, New York. (Pl. Ex. N, Flint Dep.) In their respective trucks, Jackson and Flint crossed the Canadian border into the United States. Upon arrival at the Buffalo cleaning facility, Jackson and Flint were told that Flint's trailer could not be cleaned because Flint had been carrying a marine bio-chemical and the facility was not equipped to clean it. (Id.) Jackson and Flint continued to drive toward Langer in Jersey City, New Jersey, when a Langer dispatcher instructed them to "try and find a place" to transfer the load into Flint's unclean trailer "before we have a bigger problem." (Df. Ex. D, Flint Dep.; Pl. Ex. I, Jackson Dep.) Jackson and Flint stopped at the Flying J truck stop in Penbrook, New York.

It was dark and raining when Jackson and Flint arrived at that truck stop. (Pl. Ex. N, Flint Dep.) They decided to eat dinner and wait out the rain before beginning the transfer. (Df. Ex. D, Flint Dep.) After finishing dinner, Jackson and Flint parked their trucks next to each

**FOR PUBLICATION**

other and began the transfer process.  This required them to connect a hose from the top of

Flint's tanker to Jackson's tanker so that the load could be pumped from one to the other.  The

tankers have portals on the bottom near the ground as well, but the appropriate fittings to conduct

the transfer that way were not available.  (Df. Ex. D, Flint Dep.)

Flint climbed the ladder on his tanker to the top, wearing rubber gloves issued by Langer.

(Id.)  Jackson, who was standing on the ground beside the trailer, began to pass a hose to Flint by

pushing it up the side of the tanker.  As Flint was reaching for the hose, his hand slipped out of

his glove and he fell from the top of the tanker.  (Pl. Ex. N, Flint Dep.)  Flint came into contact

with Jackson's trailer and fell to the ground.  Jackson unhooked his tanker from his truck and

drove Flint to the hospital.  The following day, July 8, 2004, at the direction of Langer, Jackson

drove Flint's trailer to be washed out.  (Pl. Ex. I, Jackson Dep.)  Then, with the assistance of his

father, Jackson brought both tankers to his house and transferred the load from his own tanker

into Flint's.  Jackson then drove the load back to Langer in Jersey City, New Jersey.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A factual dispute between the parties will not defeat a motion for

summary judgment unless it is both genuine and material.  See Scott v. Harris, 550 U.S. 372, 380

(2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is

genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under

the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The

moving party must show that the non-moving party has failed to "set forth," by affidavits or

**FOR PUBLICATION**

otherwise, "specific facts showing that there is a genuine issue for trial." See Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Fed. R. Civ. P. 56(e)).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. Scott, 550 U.S. at 380 (citing Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of fact for trial. See Anderson, 477 U.S. at 249. In so doing, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002). To survive a motion for summary judgment, a non-movant must present more than a mere "scintilla of evidence" in his favor. Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

## DISCUSSION

### I.    IMTT-Bayonne's Motion for Summary Judgment

#### A.  *Proximate Cause*

It is a fundamental concept in tort law that causation is an element of negligence, and that in some situations causation is so attenuated that liability does not result. No case illustrates this concept more famously than Judge Cardozo's seminal opinion Palsgraf v. Long Island R.R. Co., 248 N.Y. 339 (1928). That case established the principle that one who is negligent is liable only for the harm or the injury that is foreseeable, and not for every injury that may follow from his or her negligence. The Court finds that this principle is applicable here, and concludes that even if

**FOR PUBLICATION**

IMTT had been negligent in putting Versene into the wrong type of tanker, no reasonable jury could find that the plaintiff's injuries were proximately caused by IMTT.

The Supreme Court of New Jersey has explained that "the doctrine of superseding cause focuses on whether events or conduct that intervene subsequent to the defendant's negligence are sufficiently unrelated to or unanticipated by that negligence to warrant termination of the defendant's responsibility." Lynch v. Scheininger, 162 N.J. 209, 230 (2000). The "general principles governing intervening and superseding causes are well settled. Only their application is difficult." Id. at 226. The Restatement of Torts states that:

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

Id. (citing Restatement (Second) of Torts § 440 comment (b) (1965)). Courts resolve questions of superseding cause by "focusing on whether the intervening cause is so closely connected with the defendant's negligent conduct that responsibility should not be terminated," id. at 227, or, conversely, whether the resulting injury is so attenuated from defendant's negligent conduct that responsibility *should* be terminated. "The shorthand term for that inquiry is whether the intervening cause is 'foreseeable.'" Id.

Here, IMTT put Versene into Jackson's tanker. The Court finds that it was not foreseeable that this would cause a completely different person, Flint, to fall off of a completely different truck. The causal connection was broken by either, or both, of the following intervening causes: 1) Langer's decision to instruct Jackson and Flint to

6

**FOR PUBLICATION**

perform the transload in the manner, time and place that it occurred, and 2) Flint's own conduct in climbing the ladder and falling off.

Langer was clearly at the helm of every major decision in this process. Langer set the entire sequence of events in motion by assigning the wrong tanker to Jackson. Thereafter, Jackson called Langer's dispatch center at every critical juncture and received instructions on what to do. At Langer's direction, Flint and Jackson attempted an unsuccessful transfer at the truck cleaning facility. They finally conducted the transfer, again at Langer's instruction, at a truck stop, in the dark of night, when it had just rained. The men were told to transfer the load, and they did so through the top ports (as opposed to the bottom ports, closest to the ground) because that was the only option available to them. While Flint claims that Jackson "came up with the plan" to transload the chemical through the top ports, it is evident that they did not have any other choice. They did not have the proper equipment to conduct the transfer though the bottom ports. "[A] third party's act is an intervening, superseding cause if it was either unforeseeable, or was foreseeable but conducted in an extraordinarily negligent manner." Phifer v. DuPont Country Club, 138 F. App'x 446, 448-49 (3d Cir. 2005) (citing Delaware Elec. Coop., Inc. v. Duphily, 703 A.2d 1202, 1209 (Del. 1997)). Even if it was foreseeable that the Versene would need to be transferred out of Jackson's truck, it was not foreseeable that the transfer would occur in this manner.

The plaintiff also blames defendant Jackson for his fall. He claims that Jackson was a more experienced driver, and is therefore responsible for the accident. However, the evidence indicates that Flint climbed the ladder voluntarily. When asked, "Who made the decision that you were going to be the person to climb up the ladder . . .?" Flint

**FOR PUBLICATION**

answered, "It was my truck, I'm younger, I really don't think we had a big debate on it."
(Pl. Ex. N, Flint Dep.)  Flint also said that Langer drivers were "trained originally in
different ways to unload and load," and that he had previously climbed truck ladders and
used hoses to load tankers while working for Langer.  He said that concerns about falling
off of a ladder are "part of the job."  (Id.)  In <u>Vega ex rel. Muniz v. Piedilato</u>, an
adolescent boy sued the owners of an apartment building for injuries he sustained when
he fell down an air shaft which separated the rooftops of two buildings.  154 N.J. 496,
499-500 (1998).  The plaintiff advanced numerous theories of negligence; as example,
that the access door to the roof should have been locked or that the air shaft should have
been fenced.  <u>Id.</u> at 509.  The New Jersey Supreme Court did not "believe that that a fair-
minded jury could find that the lack of security measures was the cause of the fall."  <u>Id.</u>
Instead, "[t]he cause of the accident and injuries was the plaintiff's unsuccessful effort to
leap this divide."  <u>Id.</u>  The New Jersey Supreme Court concluded that the plaintiff's
injuries were not proximately caused by the conditions of the property.  <u>Id.</u>  Similarly,
Flint's injuries were caused by Langer's decision to order the transfer, and Flint's own
unsuccessful attempt to climb the ladder and connect the hose.  IMTT's actions were not
the proximate cause of the plaintiff's fall.

**B. *Rescue Doctrine***

The plaintiff attempts to keep the chain of causation unbroken by characterizing
himself as Jackson's "rescuer," thereby invoking the rescue doctrine.  This doctrine
allows a rescuer to bring suit against the party whose negligence placed the victim in a
position of imminent peril, so as to invite the rescue.  <u>Saltsman v. Corazo</u>, 317 N.J.
Super. 237, 247 (App. Div. 1998).  Jackson was not in "imminent peril," making the

**FOR PUBLICATION**

factual circumstances here distinguishable from those in which the rescue doctrine

traditionally applies.  See, e.g., Burns v. Market Transition Facility, 281 N.J. Super. 304

(App. Div. 1995) (Good Samaritan sustained injury while rendering aid to driver trapped

in automobile); Eyrich ex rel. Eyrich v. Dam, 193 N.J. Super. 244 (App. Div. 1984)

(neighbor sustained injuries while attempting to rescue child from attack by escaped

circus leopard).

The Versene in Jackson's tanker undoubtedly created a problematic situation.

The plaintiff emphasizes the harm that could have befallen the public if the tanker had

split.  However, the situation was not so immediate or perilous to require the sort of

instantaneous action found in rescue doctrine cases.  Flint and Jackson drove with the

Versene from Canada to the truck cleaning facility in Buffalo, New York, and then from

Buffalo to the Flying J truck stop in Penbrook, New York.  They took time to eat dinner

before they attempted the transfer.  Jackson said that there were "some drops there but,

you know, to me that's serious enough to do something about it but as far as declaring an

emergency, no."  (Pl. Ex. I, Jackson Dep.)  After Flint fell, the tanker remained parked in

the lot all night and the transfer was conducted the next day.  The Court finds that Flint

did not "rescue" Jackson, and that the rescue doctrine is inapplicable.

The plaintiff, in a last ditch effort to fit his case within the doctrine, cites McKay

v. Mayronne, No. 89-7283, 1990 WL 183616 (D.C. Cir. Nov. 21, 1990) to argue that

Flint was rescuing property, rather than Jackson's person.  There, the plaintiff sought

damages for burns he sustained while trying to dispose of a pan that was on fire.  Id. at

*1.  The district court acknowledged a split of authority on the question, but "ruled that

the local court would probably allow recovery when a plaintiff is injured trying to rescue

**FOR PUBLICATION**

the property of another, so long as the plaintiff acted reasonably." <u>Id.</u> at *2.  The D.C.

Circuit affirmed.  <u>Id.</u>  Once again, this case is distinguishable because the danger in

<u>McKay</u> was imminent; the plaintiff was trying to prevent the fire from spreading to the

rest of the house.  Importantly, the plaintiff has cited no New Jersey law to support this

variation of the rescue doctrine.   The Court will not apply it.

### C.  *Inherently Dangerous Activity*

The plaintiff also argues that IMTT's motion for summary judgment should be

denied because IMTT was engaged in an "inherently dangerous activity" which requires

a higher standard of care.  This is to be distinguished from the "abnormally dangerous

activity" doctrine, which imposes strict liability upon defendants found to engage in such

activities.  <u>See</u> <u>T&E Indus. Inc. v. Safety Light Corp.</u>, 123 N.J. 371 (1991).  That doctrine

was not pled by the plaintiff and will not now be considered.  The undisputed facts do not

require nor warrant the grant of an exception.

The Court finds that the "inherently dangerous activity" theory, also not pled by

the plaintiff, is inapplicable.  In New Jersey law, there is a "long-settled doctrine" that,

ordinarily, a principal will not be held liable for the negligent acts of an independent

contractor.  <u>Mavrikidis v. Petullo</u>, 153 N.J. 117, 151 (1998).  There are three exceptions

to this rule, one of which occurs when "the activity contracted for by the landowner is

inherently dangerous or involves a peculiar risk of harm to others unless special

precautions are taken."  <u>Majestic Realty Assoc., Inc. v. Toti Contracting Co.</u>, 30 N.J. 425,

438 (1959).  The plaintiff does not advance, and the Court is not aware of, any case when

the doctrine was applied outside this specific context.  The "inherently dangerous

**FOR PUBLICATION**

activity" exception is simply irrelevant. There is no principal/contractor relationship between the plaintiff and IMTT here.

    **II.**    <u>**Jackson's Motion for Summary Judgment**</u>

        The factual background described is relevant to Jackson's motion for summary judgment, and broadened by these additional facts regarding Flint and Jackson's employment with Langer:

        Both plaintiff Flint and defendant Jackson worked for Langer as truck drivers. Each had signed an Owner/Operator Mutual Lease Agreement (the "Agreement"), which characterized their relationship with the Carrier (Langer) as that of "independent contractor." (Pl. Ex. A, Jackson Mutual Lease Agreement; Pl. Ex. D, Flint Mutual Lease Agreement.) Under the Agreement, drivers are responsible for their own insurance, maintenance, repair, fuel and costs. (<u>Id.</u>) In return for their services, drivers receive a payment from Langer based upon the actual weight or gallonage transported. (Pl. Ex. B, Jackson Dep.) Langer does not deduct payroll taxes, social security or disability insurance from drivers' pay. (Pl. Ex. A, Jackson Mutual Lease Agreement; Pl. Ex. D, Flint Mutual Lease Agreement.) Mr. Jackson began working for Langer in June of 2002, and derived all his income from work for Langer. (Pl. Ex. B, Jackson Dep.) Flint worked for Langer from April or May of 2004, until the accident occurred in July of 2004. (Pl. Ex. C, Flint Dep.) Drivers received shirts and other clothing emblazoned with Langer's name. (Pl. Ex. B, Jackson Dep.)

        The Agreement states that "Workmen's Compensation coverage will be provided to drivers at a rate of 3.4% of total earnings." (Pl. Ex. A, Jackson Mutual Lease Agreement; Pl. Ex. D, Flint Mutual Lease Agreement.) This amount is deducted from

**FOR PUBLICATION**

drivers' pay checks.  (Id.; Pl. Ex. B, Jackson Dep.)  There are two Owner-Operator

Revenue Packages offered to drivers; both include the 3.4% deduction for workers'

compensation.  (Df. Ex. 9, Owner-Operator Revenue Packages.)  After his injury, Flint

sought and received workers' compensation benefits.  (Df. Ex. 3, Petition for

Compensation.)  The plaintiff does not deny that he received benefits, but argues that the

"nature of Flint's Owner/Operator agreement and Flint's election to apply for Worker's

Compensation benefits is not an issue before this court."  (Pl. Response to Jackson's

Statement of Material Facts, ¶ 6.) On July 17, 2007, the plaintiff filed a stipulation of

dismissal with prejudice of his claim against Langer.  (ECF No. 25.)  Jackson asserts that

this dismissal was a result of the workers' compensation exclusivity bar.  Flint does not

deny dismissing his complaint against Langer, but argues that "[t]he reasoning behind the

voluntary dismissal is not an issue before this court."  (Pl. Response to Jackson's

Statement of Material Facts, ¶ 7.)

The Court begs to differ.  The plaintiff's receipt of benefits is entirely relevant to

Jackson's argument that the fellow servant bar of N.J. Stat. Ann. § 34:15-8 applies to the

tort claims brought against him.  The plaintiff argues that he was an independent

contractor, and that the fellow-servant bar does not apply because Jackson was an

independent contractor also.  However, "[a] person who is an 'employee' is entitled to

workers' compensation, and a person who is an 'independent contractor' is not."

Frappier v. Eastern Logistics, Inc., 400 N.J. Super. 410, 415 (App. Div. 2008) (citation

omitted).  Flint has already received workers' compensation benefits, making him an

employee for workers' compensation purposes.  As noted by the Supreme Court of New

Jersey:

FOR PUBLICATION

> The Legislature did not intend workers to have an election of remedies
> after agreeing pursuant to N.J.S.A. 34:15-7 to accept the provisions of the
> Act unless they fall within a few limited exceptions.  The Act mandates
> that workers' compensation is the exclusive remedy for an injured
> employee against an employer for injuries arising out of and during the
> course of employment. N.J.S.A. 34:15-8.

Kristiansen v. Morgan, 153 N.J. 298, 311-12 (1998).  It is not alleged that any exceptions

apply here.  The exclusivity rule applies to both an employer and fellow employees:

> If an employee experiences a compensable accident, he may not maintain a
> common law tort action against a fellow employee arising out of the same
> incident.  This result is mandated by N.J.S.A. 34:15-8, which provides that if an
> injury is compensable, a person in the same employ shall not be liable on account
> of such injury, except for an intentional wrong.

Barone v. Harra, 77 N.J. 276, 279 (1978).  Flint has accepted benefits and has been

deemed an employee under the Act.  He does not allege that Jackson intentionally hurt

him.  Flint cannot now argue that he was not an employee, and that the limits of the Act

should not apply to him.  See, e.g., Fouchecourt v. Metro. Opera Ass'n, 537 F. Supp. 2d

629, 634 (S.D.N.Y. 2008) (an employee received benefits under the Workers'

Compensation Law, and "having accepted these benefits, he cannot very well argue now

that the limitations of the statute should not apply.")

Even assuming, for the sake of argument, that Flint's claim against Jackson were

viable, the Court would be precedent-bound to find that Flint and Jackson were

employees.  There are two tests to determine if a worker is an employee or an

independent contractor: the "control test" and the "relative nature of the work test."

Kertesz v. Korsch, 296 N.J. Super. 146, 152 (App. Div. 1996).  "Under the control test,

the right to control is usually inferred from direct evidence of right of control and

exercise of control."  Tofani v. Lo Biondo Bros. Motor Exp., Inc., 83 N.J. Super. 480,

486 (App. Div. 1964).  Under the relative nature of the work test, courts consider

**FOR PUBLICATION**

"whether the work done is an integral part of the employer's regular business."  Id.

These tests are irrelevant to our discussion because they are used to determine whether a

person is eligible for benefits (i.e., an employee), and Flint has already received benefits.

The plaintiff nonetheless insists that both men were independent contractors.   He argues

that the Agreement characterized them as such, they were responsible for their own

insurance, maintenance, repair, fuel and costs, and Langer did not deduct payroll taxes,

social security or disability insurance from their pay checks.

     In Rutherford v. Modern Transp. Co., the widow of a truck driver brought an action

for the truck driver's wrongful death against the trucking company he worked for,

contending that the driver had been an independent contractor and that the suit was not

barred.  128 N.J. Super. 504, 505 (Law Div. 1974).  The court found that:

> [T]he effort by [the employer] to divest itself of the various formal trappings
> of the employer-employee relationship in connection with agency, taxes,
> reports, etc., is of no great significance.  What is more significant under
> modern tests for the determination of the employer-employee relationship is
> the fact that [the employee] spent all his time and derived all his income from
> the work accomplished for [the employer] and that the nature of the work
> performed by him was but a cog in the overall operation of [the employer's]
> business.

Id. at 509-10.  The driver "had to report daily at a certain time to [the employer's] place

of business and was directed by the foreman as to the location where he was to make his

pick-ups." Id. at 510.  (For additional cases in which truck drivers were found to be

employees in factually analogous circumstances, see Caicco v. Toto Brothers, Inc., 62

N.J. 305 (1973); Tofani v. Lo Biondo Bros. Motor Exp., Inc., 83 N.J. Super. 480 (1964)).

     In this matter, the control test is satisfied because Langer told Flint and Jackson

where to go and when.  They had no discretion in that regard.  Also, as described earlier,

once Jackson realized that he was carrying Versene in an aluminum trailer, a Langer

**FOR PUBLICATION**

dispatcher was consulted at every critical juncture along the way.  Finally, both Jackson

and Flint worked for Langer exclusively, and relied upon Langer for their income.  They

were issued clothing with the Langer logo, and the jobs they performed were an integral

part of Langer's business.  That they "paid for their own" workers' compensation

insurance is not dispositive.  First, the insurance was secured for drivers by Langer, and

the workers had no choice but to pay for it with 3.4% of their earnings.  Furthermore,

workers have been found to be employees when no workers' compensation deductions

were made, see Tofani, 83 N.J. Super. at 496, and when the employee secured workers'

compensation insurance independently,  see Caicco, 62 N.J. at 311.  Both the control test

and the relative nature of the work test bring Flint and Jackson within the ambit of New

Jersey's workers' compensation law.  Flint's claim against Jackson is barred.

### III.   Langer's Motion for Summary Judgment

On December 7, 2006, IMTT filed an answer to the plaintiff's second amended complaint

which contained a cross-claim against Langer.  (ECF No. 10.)  Jackson filed an answer to

plaintiff's third amended complaint on April 24, 2008, which also contained a cross-claim

against Langer.  (ECF No. 36.)  On September 23, 2010, Langer filed a motion for summary

judgment on all cross-claims.  (ECF No. 58.)  Because the Court has granted the summary

judgment motions of IMTT and Jackson, Langer's motion for summary judgment is moot.

### CONCLUSION

Defendant IMTT's motion for summary judgment is GRANTED.   Defendant Jackson's

motion for summary judgment is GRANTED.  IMTT's motion to strike is moot.  Defendant

Langer's motion for summary judgment is moot.

**s/ William H. Walls**
United States Senior District Judge